# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 12, 2011          Decided July 15, 2011

No. 10-7062

SONYA PETTAWAY,
APPELLANT

v.

TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01721)

*Denise M. Clark* argued the cause and filed the briefs for appellant.

*Andrew M. Altschul* argued the cause and filed the brief for appellees Teachers Insurance and Annuity Association and Standard Benefit Administrators.

*Karla Grossenbacher* was on the brief for appellee National Academy of Sciences Group Total Disability Insurance Plan.

Before: SENTELLE, *Chief Judge*, GINSBURG and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*:  After injuring her back in a car accident, Sonya Pettaway filed for and received long-term-disability benefits from the insurance plan sponsored by her employer.  After providing benefits to Pettaway for several years, the claims administrator of that plan determined that Pettaway no longer qualified under the plan and terminated her benefits.  Pettaway brought suit pursuant to the Employee Retirement Income Security Act of 1974 against her employer and the administrators and underwriters of her employer-sponsored long-term-benefit disability insurance policy.  Finding no violation of law, the district court granted the defendants' motion for summary judgment, and Pettaway appealed.  Because the district court properly granted summary judgment, we affirm the district court's decision.

**I.**

Plaintiff-appellant Sonya Pettaway was employed by the National Academy of Sciences ("the Academy") for seven years and participated in the National Academy of Sciences Group Total Disability Insurance Plan ("the Plan"), provided as a benefit for employees by the Academy.  The Academy Plan was created pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and was governed by three separate documents.  The first document was the Academy Total Disability Insurance Plan description (the "Plan Document"), a document created by the Academy which outlined general aspects of the Academy Plan.  The second document was the Total Disability Insurance Plan Summary (the "Summary Plan Description"), a plain language summary of the participants' rights and obligations under the Academy Plan.  The last document was the Group Total Disability Insurance Certificate (the "Policy Document"), a document created by

Teachers Insurance and Annuity Association ("TIAA"), the Academy Plan's underwriter and claims administrator, which described the main features of the insurance under the group policy that TIAA issued to the Academy. At some time in or around the year 2003 (the record is unclear as to the exact date), Standard Benefit Administrators took over administration on behalf of TIAA. As there appears to be no legal distinction between the two entities relevant to this litigation, we will refer to TIAA and Standard jointly and separately as "TIAA."

The Academy Plan provided disability benefits to eligible participants who qualified as "totally disabled" under the terms of the plan. The plan employed two different definitions of totally disabled, one concerning the first twenty-four months during which a participant received benefits and a more rigorous definition after that twenty-four month period. During the initial two-year period, the Academy Plan defined totally disabled as "being completely unable due to sickness, bodily injury, or pregnancy to perform the material and substantial duties of [the participant's] Normal Occupation." Policy Document at 8.1. To continue to qualify as totally disabled after the initial period, the Academy Plan required participants to be unable "to perform the material and substantial duties of *any* occupation for which [the participant is] reasonably qualified by education, training, or experience." *Id*. (emphasis added). During both periods, the plan also required that participants be under the "Regular Care" of a physician, defined as "regular in-person visits with [the participant's] Physician as frequently as required under standard medical practice to effectively manage and treat [the participant's] disabling sickness or injury." *Id*. "Regular Care" also required participating in "a reasonable program of care and treatment that is, in accordance with accepted medical practice, expected to enhance your ability to work . . . ." *Id*. In accordance with ERISA's statutory requirements, the Academy Plan provided participants with the opportunity for a "full and

fair" internal administrative review of any denial of participant benefit claims.

In January of 2000, while employed by the Academy and while participating in the Academy Plan, Pettaway suffered a back injury in an automobile accident. The injury, which required back surgery, prevented Pettaway from performing her usual duties, so Pettaway filed the total disability claim underlying the present litigation. Agreeing that Pettaway qualified as "totally disabled" as defined by the Academy Plan for the first twenty-four months, TIAA approved Pettaway's claim and began providing disability benefits effective August 1, 2000. In September 2001, in preparation for the end of the initial two-year benefits period, TIAA began reviewing Pettaway's file and requesting additional medical information from Pettaway to determine if she would qualify for benefits under the Academy Plan's more rigorous definition of total disability. After performing an independent medical examination and assessing Pettaway's medical record, TIAA concluded that Pettaway did not qualify for benefits beyond the initial twenty-four month period and notified her that it would cease paying benefits after December 2002.

Pursuant to the Academy Plan's administrative review provisions, Pettaway requested an internal review of TIAA's decision to terminate her benefits. Pettaway failed, however, to provide TIAA with any new evidence to support her total disability claim. Noting that it had "no diagnostics or physical exam findings on file" to support Pettaway's complaint, TIAA affirmed its decision to cease paying benefits after December 2002. Letter from Iserdai Burston, Group Benefits Analyst, TIAA, to Sonya Pettaway (Jan. 14, 2003). TIAA notified Pettaway of the results of the administrative review, informed her that she still had 180 days to submit another written request for further review, and recommended that any future request

should be accompanied by relevant medical documentation that would support her disability claim.

Over the course of the next six months, a series of events caused TIAA to reconsider its decision to cancel Pettaway's benefits. First, Pettaway returned to the "Regular Care" of her back surgeon, whom she had not seen for over two years. This was significant because, as discussed above, by resuming medical treatment and monitoring of her disability by her physician, Pettaway satisfied a significant condition of her long-term-disability policy. Furthermore, Pettaway aggravated her back injury twice, once during a slip-and-fall accident in January 2003 and again during a second car accident in April 2003. As a result of the additional injuries, Pettaway's back surgeon recommended that Pettaway undergo a second back surgery. In light of Pettaway's new injuries, her pending back surgery, and her return to the "Regular Care" of her surgeon, TIAA reinstated Pettaway's long term disability benefits in August 2003, requesting that she provide TIAA with an update of her medical condition after her back surgery.

Beginning in November 2003, TIAA began requesting from Pettaway updates on her medical status. In January 2004, Pettaway's back surgeon sent TIAA a brief letter stating his opinion that Pettaway could not "return to any type of gainful employment." Letter from Bernard Stopak to Whom It May Concern (Jan. 23, 2004). In June 2004, Pettaway's surgeon, Doctor Stopak, sent a brief report to TIAA in which he explained that Pettaway had not yet undergone her second back surgery and that she was unable to "return to any type of work whatsoever at [that] time." Bernard Stopak, Supplemental Neurological Report (June 24, 2004). The surgeon did not provide TIAA with any medical data or test results with either the letter or the report. Hoping to obtain objective medical data, TIAA scheduled an independent medical examination and a

functional capacity examination for Pettaway, but she did not attend either test. On August 12, 2004, lacking "objective medical documentation to support [Pettaway's] inability to perform any occupation," TIAA terminated Pettaway's benefits effective August 31, 2004. Letter from Carmen Lourensz, Senior Disability Benefits Analyst, Standard Benefit Administrators, to Sonya Pettaway (Aug. 12, 2004). As before, TIAA informed Pettaway that she had 180 days to request an internal administrative review of the termination decision and suggested that she include any new medical evidence with her request for review.

Pettaway wrote to TIAA in October 2004 requesting an administrative review of its decision to terminate her disability benefits. In response to TIAA's statement that it lacked independent medical evidence to support Pettaway's disability claim, Pettaway included with her request two additional medical reports from her surgeon. TIAA forwarded Pettaway's file and the new medical reports to its Quality Assurance Unit, a separate in-house group that, according to TIAA, exists specifically to assure that each claim receives a fair and objective review by individuals who were not involved in the original determination. In addition to reviewing Pettaway's existing file, the Quality Assurance Unit took several actions to develop its own evidence. First, it offered Pettaway another opportunity to attend the previously requested independent medical and functional capacity examinations. Although it made three attempts to contact Pettaway to schedule the examinations, Pettaway never responded and the tests were not performed. The Quality Assurance Unit also hired a consulting physician to review all of the medical records in Pettaway's file. The reviewing physician disagreed with Pettaway's back surgeon's conclusions regarding Pettaway's disability, stating "the medical information provided does not support that the claimant has limitations and restrictions due to her back

condition that would preclude her from performing any gainful employment." Mary Lindquist, Physician Consultant Memo (Mar. 2, 2005). Finally, based on the reviewing physician's assessment of Pettaway's ability to work, the Quality Assessment Unit performed a "transferable skills assessment" to determine whether Pettaway would be able to find comparable work in her labor market. That assessment indicated that positions were available in six different comparable occupations in sufficient numbers to allow Pettaway to reenter the workforce. In March 2005, based on the consulting physician's review of Pettaway's medical file, the results of the transferable skills assessment, and the lack of objective medical data to support Pettaway's claim, the Quality Assurance Unit upheld the termination of Pettaway's long-term-disability benefits.

While the administrative appeal process was ongoing, Pettaway had also filed a complaint with the District of Columbia Department of Insurance and Securities Regulations ("DOI"). In May 2005, two months after the close of the TIAA administrative process, the DOI contacted TIAA to inform them that Pettaway was attempting to schedule the previously requested independent medical and functional capacity examinations at her own expense and asked if TIAA would be willing to pay for the examinations. TIAA agreed to reopen the Quality Assurance Unit's review and to arrange and pay for Pettaway's examinations. The examinations were finally conducted in June and July of 2005.

The physical therapist who performed the functional capacity examination concluded that Pettaway was capable of sedentary work. The therapist noted, however, that "[d]ue to the extent of self-limiting on the endurance tasks of the test, it is difficult to predict whether [Pettaway] can sustain the Sedentary level of work for the 8 hour day." Christian Wheeler, Physical Work Performance Evaluation Summary (July 5, 2005). The

therapist observed inconsistencies in Pettaway's performance, which combined with Pettaway's self-limiting behavior, heavily influenced the outcome of the functional capacity examination.

The doctor who performed the independent medical examination also observed inconsistencies in Pettaway's capabilities and limitations. He stated that "there are gross inadequacies between what the claimant can perform when she's not on the exam table versus what she does on the exam table," and that his "objective findings do not correlate with the claimant's stated diagnosis and findings." Letter from John Hennessey, Associated Neurologist, P.C., to Laura Mizner, MedReps (July 21, 2005). The doctor concluded that Pettaway "is ready for sedentary activity" and recommended that she begin with four-hour days and then transition into full-time work "within a month or two of starting half a day work cycles." *Id*.

After the completion of the independent medical and functional capacity examinations, the Quality Assurance Unit obtained another independent medical review from a new consulting physician. That physician diagnosed Pettaway with mechanical back pain and concluded that Pettaway's record indicates that "she cannot perform full-time sedentary level work." Ronald Fraback, Physician Consultant Memo (Aug. 25, 2005). The physician offered to consult directly with the doctor who performed the July independent medical examination, but he doubted that the consultation would result in that doctor changing his conclusion.

Based on the results of the independent medical and functional capacity examinations, the results from the transferable skills assessment, and the independent medical review of Pettaway's file, the Quality Assurance Unit concluded that Pettaway was capable of returning to part-time employment. Because the Academy Plan covered only total disability, and not

partial disability, the Quality Assurance Unit concluded that Pettaway did not qualify under the terms of the plan and again upheld TIAA's decision to terminate Pettaway's long-term-disability benefits.   In a September 2005 letter notifying Pettaway of the results of the administrative review, TIAA informed Pettaway that her right to an administrative review had been satisfied and that, therefore, TIAA was closing her claim.

In March 2006, Pettaway sent additional documents to TIAA in an attempt to supplement her claim for long-term-disability benefits.  TIAA returned the materials stating that Pettaway's administrative review had been completed and that her claim was closed.  In September 2007, Pettaway filed suit in the district court, claiming that the Academy and TIAA violated ERISA by wrongfully terminating her benefits and by failing to follow the proper procedures while administering her claim. The parties cross-moved for summary judgment and the district court granted TIAA's motion, upholding TIAA's termination of Pettaway's benefits. *Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*, 699 F. Supp. 2d 185, 209 (D.D.C. 2010).

## II.

We review the district court's grant of summary judgment in an ERISA denial-of-benefits case *de novo*.  *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 491-92 (D.C. Cir. 1998). Pettaway challenges three aspects of the district court's opinion. First, she argues that the district court applied the wrong standard of review when it considered whether TIAA wrongfully terminated her benefits.   Second, Pettaway argues that the district court misapplied the requirement, contained in ERISA and Department of Labor regulations promulgated thereunder, that she receive "full and fair review" of her appeal of TIAA's termination of her benefits. Finally, Pettaway argues that the district court violated its local rules by failing to require

the filing of the entire administrative record in connection with the defendants' motion for summary judgment.

**A.**

Pettaway argues that the district court erred when it applied a deferential standard of review to the court's review of TIAA's decision to terminate her benefits. *See Pettaway*, 699 F. Supp. 2d at 201 (holding that the district court "must employ a discretionary, or 'reasonableness' review to the eligibility determination"). Pettaway asserts that a *de novo* standard should have been applied for two reasons: because the Policy Document did not grant discretionary authority to TIAA to interpret the terms of the group policy; and because the Academy, as fiduciary of the Academy Plan, limited its own fiduciary duties to determining eligibility and therefore had no discretion to delegate interpretation authority to TIAA.

We review a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B), under a *de novo* standard, rather than under the more deferential arbitrary and capricious standard, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Fitts v. Fed. Nat'l Mortgage Ass'n*, 236 F.3d 1, 5 (D.C. Cir. 2001). The key dispute between the parties in this appeal is to which of the three Academy Plan documents—the Plan Document, the Summary Plan Description, or the Policy Document—the court may look to determine whether "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Pettaway argues that only the Policy Document is legally relevant. TIAA and the Academy argue that all three documents must be considered together. Although the question is one of first impression in this

circuit, we agree with the district court that in this case all three documents should be examined to determine the appropriate standard of review.

Our decision to look at all of the Academy Plan documents is supported both by the text of ERISA and by the weight of authority from the other circuits that have considered this question. First, ERISA's statutory text suggests that multiple plan documents can be legally relevant. ERISA requires that a "summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries" and specifies that it "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). The statute further requires that the summary plan description contain, *inter alia,* "the plan's requirements respecting eligibility for participation and benefits" and the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). Far from being an irrelevant piece of human resources material, the Summary Plan Description is the ERISA-mandated, plain-language document upon which plan participants may rely to understand their benefits.

Furthermore, the ERISA sections on fiduciary responsibilities imply that there will be multiple legally important plan documents. The section defining "fiduciary duties" states that the plan fiduciary—in this case the Academy—"shall discharge his duties with respect to a plan . . . in accordance with the *documents and instruments* governing the plan." 29 U.S.C. § 1104(a)(1)(D) (emphasis added). The ERISA section governing reporting and disclosure also references multiple documents. It requires the administrator of a benefits plan to "furnish to the Secretary [of the Department of

Labor], upon request, any documents relating to the employee benefit plan, including but not limited to, the latest summary plan description (including any summaries of plan changes not contained in the summary plan description), and the bargaining agreement, trust agreement, contract, or other instrument under which the plan is established or operated." 29 U.S.C. § 1024(a)(6). Far from suggesting that one plan document must contain all the legally relevant terms and language, the statutory text clearly contemplates multiple relevant documents.

Other circuit courts that have considered this question have also generally concluded that multiple plan documents are legally relevant. For example, in *Young v. Verizon's Bell Atl. Cash Balance Plan*, the Seventh Circuit held that because both a "summary plan description" and a "summary of any material modification" are ERISA-required writings, each should be given primary effect and strictly enforced. 615 F.3d 808, 817-18 (7th Cir. 2010). Relying on the text of 29 U.S.C. § 1024(a)(6), the Eleventh Circuit recognized that many documents control the operation of a benefits plan under ERISA, including the summary plan description, the bargaining agreement, the trust agreement, the contract, and other instruments. *Heffner v. Blue Cross and Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1342-43 (11th Cir. 2006). The Sixth Circuit recognized the importance of the summary plan description, concluding that "statements in a summary plan are binding and if the statements conflict with those in the plan itself, the summary shall govern." *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 582 n.10 (6th Cir. 2006) (citation omitted). Similarly, many circuits have recognized the legal significance of summary plan descriptions. *See, e.g.*, *Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1143 (9th Cir. 2002) ("[T]he SPD is a plan document and should be considered when interpreting an ERISA plan."); *Hughes v. 3M Retiree Medical Plan*, 281 F.3d 786,790 (8th Cir. 2002) (same);

*Fallo v. Piccadilly Cafeterias, Inc.*, 141 F.3d 580, 583-84 (5th Cir. 1998) (same); *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996) (same).

Based on the text of ERISA we hold, consistent with the decisions of the other circuits, that the district court properly considered the Plan Document, the Summary Plan Description, and the Policy Document to determine the appropriate standard of review to apply in this case.

Having so concluded, the remaining analysis is straightforward. As stated in the Plan Document, the "Academy shall be the Plan Administrator and the 'Named Fiduciary'" with the "absolute power, authority and discretion to administer the [Academy] Plan." Plan Document at 3.1, 3.2. "All interpretations of the Plan, and questions concerning its administration and application, shall be determined" by the Academy, which has the authority to "appoint such accountants, counsel, specialists, and other persons as it deems necessary or desirable in connection with the administration of the Plan." *Id.* at 3.2. Furthermore, the Summary Plan Description grants TIAA "full power and discretionary authority under the group policy to control and manage the operation and administration of the group policy, subject only to the participant's rights of review and appeal under the group policy." Summary Plan Description at 8. The Summary Plan Description further explains:

> TIAA has all powers necessary to accomplish these purposes in accordance with the terms of the group policy including, but not limited to, the following: (1) *determining the benefits and amounts payable therefor to any participant or beneficiary*; (2) establishing and administering a claims review and appeal process; and (3) *interpreting, applying, and administering the provisions of*

> *the group policy.*

*Id.* (emphasis added).

This language establishes that, under the Academy Plan, denial-of-benefits determinations by TIAA qualify for deferential review under the Supreme Court's test in *Firestone Tire & Rubber. See Fitts,* 236 F.3d at 5 (quoting 489 U.S. at 115). The Academy Plan reserved for the Academy "absolute power, authority and discretion to administer the Plan" and also the ability to delegate specific powers to TIAA as the plan administrator. The Academy Plan entrusted TIAA with "full power and discretionary authority" to both determine eligibility for benefits and to construe the terms of the plan. We conclude, therefore, that the district court did not err by employing a deferential standard of review to TIAA's eligibility determination.

"This court has defined the *Firestone* deferential standard as one of 'reasonableness,'" *Wagener v. SBC Pension Benefit Plan-Non Bargained Program*, 407 F.3d 395, 402 (D.C. Cir. 2005) (quoting *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1452 (D.C. Cir. 1992)), so we must decide whether TIAA acted reasonably when it denied Pettaway's benefits claim. Pettaway's case presented TIAA with conflicting evidence. Pettaway's back surgeon determined that Pettaway was unfit to work, but TIAA's own doctors found that Pettaway could return to part-time employment. TIAA's doctors also disagreed with Pettaway's surgeon on his interpretation of Pettaway's medical records. The Supreme Court has held that in the ERISA context, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Faced with contradicting opinions and with no requirement to prefer one opinion over another, we cannot conclude that TIAA acted unreasonably when it valued the opinion of its own personnel over that of Pettaway's surgeon. TIAA offered a rational explanation for its decision, which was reasonably derived from the medical evidence in the administrative record. TIAA did not "arbitrarily refuse to credit" Pettaway's evidence, *see id.*, but credited one medical opinion over conflicting evidence. Because TIAA acted reasonably, we conclude that TIAA's termination of Pettaway's benefits complied with federal law.

**B.**

Pettaway next argues that the district court erred when it held that the TIAA's administrative review of her claim satisfied ERISA's "full and fair review" requirement. Pettaway asserts that TIAA's appeal process was unlawful due to a variety of procedural flaws, the most serious of which was TIAA's alleged failure to give Pettaway the opportunity to challenge TIAA's September 2005 decision to uphold its August 2004 termination-of-benefits determination. Although Pettaway contends that the September 2005 decision was a second "adverse determination" from which she should have had the opportunity to appeal, we disagree.

Under ERISA, the Department of Labor requires every employee benefit plan to "establish and maintain a procedure by which a claimant shall have a *reasonable* opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a *full and fair review* of the claim and the adverse benefit determination." 29 C.F.R. § 2560.503-1(h) (emphasis added). Beyond specific procedural requirements specified in the regulations, *see* 29

C.F.R. §§ 2560.503-1(h)(1) to (4), none of which is alleged to have been violated in this case, the administrative review process need only be reasonable and afford the participant a "full and fair review."

Pettaway suffered an adverse determination in August 2004 when TIAA determined that she was no longer eligible for long-term-disability benefits. This adverse determination triggered her right under ERISA to a full and fair administrative review, which TIAA initially conducted between October 2004 and March 2005. TIAA then voluntarily reopened its review in May 2005 to permit Pettaway to undergo the independent medical and functional capacity examinations that she had previously failed to attend. In September 2005, after both of those examinations and an independent physician review, TIAA issued its final decision upholding the August 2004 denial of long-term-disability benefits. We conclude that TIAA satisfied its obligation to provide Pettaway with "a reasonable opportunity to appeal an adverse benefit determination." 29 C.F.R. § 2560.503-1(h).

We draw this conclusion for several reasons. First, contrary to Pettaway's assertion, TIAA's September 2005 decision was merely confirmatory of its early determination that Pettaway did not qualify for long-term-disability benefits. Although TIAA had new information to consider during the administrative review—the results of the independent medical and functional capacity examinations, the results from the transferable skills assessment, and the independent medical review of Pettaway's file—its conclusion was the same: that Pettaway did not qualify as totally disabled under the Academy Plan. The results of the additional tests and reviews did not provide a new basis for terminating Pettaway's benefits, but merely supplemented its initial reasoning. Second, we will not punish TIAA for voluntarily reopening its administrative review

process. As Pettaway conceded at oral argument, "there was no reason for [TIAA] to reopen it" and nothing in ERISA compelled TIAA to do so. Or. Arg. at 24:56–25:04. TIAA reopened Pettaway's review solely to give her an additional opportunity to prove her claim. We cannot hold that this benevolent act made Pettaway's review any less reasonable, full, or fair. Finally, as other circuits have noted, even though new medical reports were generated during TIAA's administrative review, the regulations provide for the "opportunity to appeal an adverse benefit determination," 29 C.F.R. § 2560.503-1(h)(1), and not for the opportunity to engage in a continuous cycle of appeals from appeals. *See, e.g.*, *Midgett v. Washington Group Intern. Long Term Disability Plan*, 561 F.3d 887, 895 (8th Cir. 2009) ("[R]equiring a plan administrator to grant a claimant the opportunity to review and rebut medical opinions generated on administrative appeal 'would set up an unnecessary cycle of submission, review, re-submission, and re-review.'") (quoting *Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1166 (10th Cir. 2007)); *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245-46 (11th Cir. 2008) (same). Limiting Pettaway to a single administrative review of the original adverse benefit determination when the review upheld the denial on the same basis as the initial decision does not violate the requirement that the review be "full and fair."

Finding none of Pettaway's procedural claims persuasive, we conclude that the district court did not err when it held that the TIAA did not violate Pettaway's right to a full and fair review of her adverse eligibility determination.

## C.

Finally, Pettaway argues that the district court violated the district court's local rule 7(h) by failing to require the filing of the entire administrative record in connection with the appellees'

motion for summary judgment.  Because Pettaway failed to make this argument before the district court, we would normally reject it now.  *See Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1537 (D.C. Cir. 1984) ("Ordinarily, in reviewing motions for summary judgment, the appellate court considers only those matters presented to the district court, disregarding additional allegations raised for the first time on appeal."), *vacated on other grounds*, 471 U.S. 1113 (1985); *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984); *Tarpley v. Greene*, 684 F.2d 1, 7 n.17 (D.C. Cir. 1982).  Pettaway offers no compelling reason why we should deviate from our normal policy in this case.  Finding none ourselves, we will not do so.

## III.

For the foregoing reasons, the district court properly granted the Academy and TIAA's motion for summary judgment.  We affirm the decision of the district court.

*So ordered.*