# United States Court of Appeals

## For the First Circuit

No. 09-1069

CHERYL WALLACE,

Plaintiff, Appellant,

v.

JOHNSON & JOHNSON; BROADSPIRE SERVICES, INC.;
JOHNSON & JOHNSON LONG TERM DISABILITY INCOME PLAN FOR
CHOICES ELIGIBLE EMPLOYEES OF JOHNSON & JOHNSON AND AFFILIATED
COMPANIES; JOHNSON & JOHNSON PENSION COMMITTEE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Boudin and Dyk,[*]

Circuit Judges.

Inga S. Bernstein with whom Ruth O'Meara-Costello and Zalkind,
Rodriguez, Lunt & Duncan LLP were on brief for appellant.
David C. Henderson with whom Alexa H. O'Keefe and Nutter
McClennen & Fish, LLP were on brief for appellees.

October 14, 2009

[*]Of the Federal Circuit, sitting by designation.

**BOUDIN**, <u>Circuit Judge</u>. Starting in July 1989, Cheryl Wallace worked for nearly fourteen years for Ortho Biotech, Inc. ("Ortho Biotech"), an operating company in the Johnson & Johnson family of companies. She was covered by Johnson & Johnson's Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson and Affiliated Companies ("the Plan"). On this appeal, Wallace--now on disability leave and relying upon the Employee Retirement Income Security Act of 1974 ("ERISA")--contests a determination of the amount of benefits due to her under the Plan.

The background facts are undisputed. In August 1999, after holding other positions, Wallace began working as a district manager--a management position compensated by salary plus sales commissions. In 2001, she requested and was approved for a short-term disability leave due to a manic/mixed bipolar episode. Thereafter, she returned to the position but, at some later point, she agreed with her supervisor to be transferred to a non-management sales position, called "territory manager," to reduce employment-related stress and travel that otherwise might worsen her condition.

The territory manager position was compensated by salary and sales commissions. Ortho Biotech agreed that, for the time being, Wallace's salary would not change. The company completed various job change formalities in September 2002, including a "Job

Change, Employee Type or Title Change" form on September 12, and a "Territory Change Notification" form on September 13; and Wallace's position transfer was made effective as of September 16.

Wallace was never able to work a day in the new position, because she again became ill. Her doctor sent a letter dated September 13, 2002, stating that for medical reasons Wallace was unable to work in the week of September 16. Wallace was hospitalized in serious condition on September 17 and was discharged on October 4; she used sick time and vacation time at the start and began short-term disability leave on October 7. Without returning to work, she commenced long-term disability leave on April 7, 2003, and remained on leave during the case.

Wallace began receiving benefits under the Plan in 2003. At that time, the Plan's claims administrator was Broadspire Services, Inc. ("Broadspire"); although that company had a different name during part of the relevant period, we refer to it as Broadspire throughout. At Broadspire's behest, the Plan initially paid Wallace $8,809.14 per month in long-term disability benefits, a figure it reached by summing Wallace's annual salary and her commissions earned in 2001, multiplying by 60 percent as prescribed by Wallace's Plan option, and dividing by 12.[1]

_____

[1]The Plan requires that the participant be disabled for 26 continuous weeks before beginning to receive long-term disability benefits. In determining benefits, the Plan looks to the salary at the start of that 26-week period--here, such period for Wallace began in 2002--and, to the extent that commissions are included in

In or around May 2005, an audit led Broadspire to conclude that Wallace had been overpaid and that her benefits should not have included her 2001 commissions because they were earned while she was in a management position; it determined that her benefits should be reduced to $5,489.98 per month based on salary alone and that benefits should be withheld until the overpayment was recaptured. Wallace contested Broadspire's decision, arguing that she entered her leave as a territory manager--a non-management sales position--and benefits for non-management salespersons under the Plan are based on salary and commissions.

Wallace pursued her claim through administrative review and her final internal appeal was ultimately decided by Johnson & Johnson's Corporate Benefits Department ("Corporate Benefits"), to whom the Plan's named fiduciary, the Johnson & Johnson Pension Committee ("Pension Committee"), has delegated authority to render final benefits decisions. On June 24, 2006, Corporate Benefits upheld Broadspire's position, offering an explanation of its reading of the Plan. To contest the denial, Wallace filed a denial-of-benefits suit in federal district court on June 22, 2007, and, following her withdrawal of state claims, her suit is solely one under ERISA, 29 U.S.C. § 1132(a)(1)(B) (2000).

the calculation, looks to average monthly commissions earned in the full calendar year prior to the year in which the 26-week period began (in this case, the relevant commissions year is 2001).

-4-

After a discovery period, the parties filed a joint stipulation of facts, and each moved for summary judgment. The district court decided in Johnson & Johnson's favor, giving deference to the company's own reading of its Plan. The court denied as moot a motion by Wallace to strike two defense affidavits in support of the company's summary judgment motion, saying that it had not found it necessary to rely upon the affidavits. Wallace now appeals from the adverse judgment and from the denial of the motion to strike the affidavits.

Our review of the district court's decision interpreting the plan is de novo because the case was decided on summary judgment, Desrosiers v. Hartford Life & Accident Ins. Co., 515 F.3d 87, 92 (1st Cir. 2008), and any judicial review of the ERISA entity's own reading is also de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Where a fiduciary properly delegates its discretionary authority under the plan to another entity, we review that entity's exercise of the authority under a more deferential standard. See Terry v. Bayer Corp., 145 F.3d 28, 36-38 (1st Cir. 1998); Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 584 (1st Cir. 1993).

In this case, the Plan gives its named fiduciary--the Pension Committee--express power to "exercise its discretion" to decide on

-5-

benefits, construe the Plan and render binding decisions. Unquestionably, the Pension Committee purported to delegate to Corporate Benefits this authority by a 1998 written instrument. Wallace, however, argues that the delegation is invalid because allegedly the Plan did not comply with statutory preconditions for delegation and therefore--Wallace argues--no deference is due to Corporate Benefits' reading of the Plan. We agree with the company that the delegation was valid.

ERISA provides that among other things a plan "shall . . . describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan (including any procedure described in [section 1105(c)(1)])," 29 U.S.C. § 1102(b)(2); section 1105(c)(1) pertinently provides that "[t]he instrument under which a plan is maintained may expressly provide for procedures" for delegating fiduciary responsibilities to other entities, id. § 1105(c)(1). Wallace admits that the Plan allowed delegation, but says that it failed adequately to "describe any procedure" for such delegation.

That the Plan purports to allow delegation is clear: it says that the Pension Committee may "[d]elegate its authority established" by the Plan, "designate persons to assist in carrying out fiduciary duties," "allocate responsibility for the operation and administration" of the Plan, and "[a]ppoint persons or committees to assist it to perform its duties" under the Plan.

-6-

Wallace says this is not enough to comprise "procedures" for delegation. Johnson & Johnson says that--in addition to a Plan provision permitting delegation--it was required by the statute only to describe "any procedure under the plan" that it chose to establish. 29 U.S.C. § 1102(b)(2). We think both sides may be reading the term "procedure" more rigidly than is appropriate.

Congress seemingly attached no talismanic significance to the term "procedure" nor required some special level of detail. In naming "[r]equisite features" of a plan, section 1102(b) uses the term "procedure" in three instances, each relating to a quite different function (funding, delegation and amendment of the plan), 29 U.S.C. § 1102(b)(1)-(3), which suggests that "procedure" should be treated as a practical concept adapted to the function in question. Our own cases treat delegation "authority" and delegation "procedures" as more or less the same thing, using the latter phrase simply because that is the phrase that Congress used in the statute. See Terry, 145 F.3d at 37-38; Rodriguez-Abreu, 986 F.2d at 584.

For delegation, it is hard to divine what Congress could have wanted any plan to contain beyond a grant of authority to delegate, together with any limitations that might exist on any such grant or the method of making it. Beyond that, we do not see why more would be expected than that the delegating fiduciary comply with any general formalities provided in the plan or under corporate or

trust law.  Here, the delegation did specify what authority was being delegated and to whom, and Wallace does not claim that the delegation instrument in this case was deficient in generally apposite formalities.

Consonantly, the 1974 House and Senate Conference Reports on ERISA suggest only that if delegation authority were limited, that limitation should be spelled out.  The Reports explain, "[f]or example, the plan may provide that delegation may occur only with respect to specified duties, and only on the approval of the plan sponsor or on the approval of the joint board of trustees of a Taft-Hartley plan."  H.R. Rep. No. 93-1280, at 43 (1974); S. Rep. No. 93-1090, at 301 (1974).  Here, the Plan permitted delegation of benefit decisions and plan interpretation without limitation.

This means that Corporate Benefits' decision must be upheld "unless it is arbitrary, capricious, or an abuse of discretion," Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693, 698 (1st Cir. 2007).  The standard is generous--"the decision 'must be upheld if there is any reasonable basis for it,'" id. (quoting Madera v. Marsh USA, Inc., 426 F.3d 56, 64 (1st Cir. 2005))--but it is not a rubber stamp, Lopes v. Metro. Life Ins. Co., 332 F.3d 1, 5 (1st Cir. 2003).[2]  In this instance, we think that Wallace's

_____

[2]The deference may be less generous where the deciding entity has a financial stake in the outcome, Metro Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348 (2008); but in the present case the Plan is funded by employee contributions--not those of Johnson & Johnson-- and no argument has been made for such an adjustment to the

arguments are not frivolous but that Corporate Benefits' position is by no means unreasonable and so must prevail.

Wallace's argument on the merits is this:  the Plan says that disability benefits are based on "Regular Monthly Earnings" and that, for a regular full-time employee, this means "monthly earnings excluding bonuses, overtime, or any other form of extra compensation in effect at the date of the beginning of" the disability period; she was a non-management sales employee at the time her disability leave began; and she is therefore entitled to the benefit of the following further provision in the definition of "Regular Monthly Earnings":

> For non-management salespersons, Regular Monthly Earnings also include paid commissions for the calendar year immediately prior to the calendar year in which beginning of the [disability period] occurs, divided by the number of whole (and partial) calendar months in such year during which such commissions were earned.

Read literally, the language is consistent with Wallace's position; but it is not the only possible reading and one may doubt that the Plan's drafters had in mind the unusual situation in which an employee switches "in the middle" from management to non-management sales status.  Because of how benefits and contributions are calculated, Wallace's reading appears likely--or so Corporate Benefits could reasonably conclude--to create a mismatch providing an unintended windfall for Wallace and a shortfall in her

standard of review.

-9-

contributions to the Plan to the detriment of other Plan participants. This, in turn, led Corporate Benefits to read includable commissions as only those earned while in a non-management sales position.

Both the windfall and the detriment depend on the way the Plan operates. As the Plan is structured, salary is the sole basis both for calculating a manager's disability benefits and required employee contributions to the disability plan; but for non-management salespersons--whose compensation ordinarily depends less on salary and more on sales commissions--both salary and commissions are included in the base for benefits and the required employee contributions.[3] The Plan is funded by employee contributions and not by the company and, in the nature of things, the aim is to make contributions cover expected benefits.

If Wallace's benefits were enhanced by counting her commissions earned in a prior year in which she was a management employee, then her disability benefits would reflect commissions for which Wallace paid no contributions to the Plan--a windfall for her. On the detriment side, the Plan would suffer a shortfall in contributions that were not required of her because she was a manager when the commissions were earned; since the Plan is funded

---

[3]The Corporate Benefits letter of June 24, 2006, so explained the salary and benefits structure, so we need not rely on an affidavit filed by the company on this or any other issue. Accordingly, like the district court, we choose not to rely on the affidavits and so regard the motion to strike them as moot.

-10-

solely by employees this shortfall is in reality a burden on them and would, from an actuarial standpoint, require an increase in Plan contributions from others or a decrease in benefits paid to them.

The failure to collect contributions based on commissions from Wallace was not some error of the company: the Plan does not require contributions on manager commissions because those commissions are not intended to support disability benefits. Nor is Wallace's offer to pay the extra contributions now meaningful. In a disability scheme like this one, contributions are small in relation to benefits because most of the contributors never become disabled. To give participants an option to increase (modestly) their past contributions for a given year, in exchange for (much larger) benefits indefinitely after a participant becomes disabled is a recipe for long-term plan insolvency.

Thus, we do not think it unreasonable for Corporate Benefits to have read the Plan as excluding from the benefit calculation commissions earned as a manager. The Plan's key sentence (quoted in context above) reads, "For non-management salespersons, Regular Monthly Earnings also include paid commissions for the calendar year immediately prior to the calendar year in which beginning of the [disability period] occurs . . . ." Corporate Benefits read "paid commissions" to mean those "earned as a non-management salesperson," relying upon the prudential concerns and internal

-11-

consistency as the basis for doing so.  Such considerations are permissible in interpreting an ERISA plan.[4]

The premises on which Corporate Benefits operated may or may not be perfect, and the rationale it employed involves judgment calls as to prudence and internal consistency, but neither the premises nor the reasoning seems to us arbitrary or capricious. Given the use of different years for determining salary and commissions under the Plan and the range of possible scenarios as to employees' changes of position, probably nothing would prevent odd results in some cases under the current Plan language. But, on the facts before us, we think the result is defensible under the deferential standard that applies.

Wallace complains that the given reasons for the denial were altered or enlarged as the review process proceeded, that she is being prejudiced by post-hoc rationalizations and that the evolution of the explanation frustrated her ability to get discovery.  In a related but broader argument, she also says only the stipulation of facts and no other evidence can be considered

---

[4]See Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st Cir. 2003) (finding that a plan administrator's interpretation of a plan was reasonable although it differed from the literal reading advanced by the plaintiff, because the plaintiff's interpretation would have imprudent implications); cf. Clair v. Harris Trust & Sav. Bank, 190 F.3d 495, 499 (7th Cir. 1999), cert. denied, 528 U.S. 1157 (2000) (rejecting a plaintiff's literal reading of an ERISA plan because it would be impractical).

because it was her understanding that the district court would decide the case on that basis alone.

Substantial shifts in rationale by the administrator may well cause prejudice in certain cases, e.g., Bard v. Boston Shipping Ass'n, 471 F.3d 229, 237 (1st Cir. 2006), but it is also true that explanations develop through stages in which one side's argument counters a more developed position. In this instance, the most complete explanation was provided in Corporate Benefits' final ruling but, while more elaborate, it is not inconsistent with what was said earlier. When the case reached the district court, this was the explanation to which argument and discovery could be addressed.

As for the defense's reliance on evidence other than the stipulation, ordinarily a stipulation establishes facts that neither side can controvert but does not prevent one side from establishing other facts by relying on anything else in the administrative or judicial record. Corporate Benefits' final letter was part of the administrative record, included as an exhibit to the joint stipulation of facts and available from the outset of the litigation in the district court.

The district court's judgment is affirmed. Each party will bear its own costs on this appeal.

It is so ordered.