FILED

FEB 23 2016

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No. NV-14-1532-DJuKi |
| ) | |
| HORIZON RIDGE MEDICAL & ) | Bk. No. S-12-13906-BTB |
| CORPORATE CENTER, LLC, ) | |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| BANK OF AMERICA, N.A., ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[1] |
| ) | |
| HORIZON RIDGE MEDICAL & ) | |
| CORPORATE CENTER, LLC; ) | |
| GORDON SILVER, ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on February 18, 2016
at Las Vegas, Nevada

Filed - February 23, 2016

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Bruce T. Beesley,[2] Bankruptcy Judge, Presiding

Appearances:     Matthew A. Olins of Duane Morris LLP argued for
Appellant; Gerald M. Gordon of Garman Turner
Gordon LLP argued for Appellees.

---

[1] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

[2] Hon. Linda Riegle and Hon. Lloyd King, Bankruptcy Judges,
also presided over portions of the underlying bankruptcy case.

Before: DUNN, JURY and KIRSCHER, Bankruptcy Judges.

This appeal follows a bitter dispute between chapter 11[3] debtor Horizon Ridge Medical & Corporate Center, LLC ("Horizon Ridge"), and its major creditor Bank of America, N.A. (the "Bank"). Horizon Ridge filed its bankruptcy case in an apparent effort to resolve a relatively minor disagreement with the Bank over tenant improvement deposits, but the case quickly spiraled out of control. Counsel for Horizon Ridge allowed the exclusivity period to expire, and the Bank proposed a plan of liquidation. Horizon Ridge engaged Gordon Silver as substitute counsel and countered with a reorganization plan of its own.

Ultimately, the bankruptcy court confirmed the Bank's plan, which required the Bank to assume the obligation of paying allowed administrative expenses. Gordon Silver applied for and received final approval of its fees and costs in the amount of $512,741.30. The Bank appeals. We AFFIRM.

## I.   FACTUAL BACKGROUND

**A.   Events prior to Gordon Silver's involvement**

From its inception, the underlying chapter 11 case has been essentially a two-party dispute between Horizon Ridge and the Bank. Horizon Ridge was the owner and operator of the Horizon Ridge Medical & Corporate Center (the "Medical Center") in Henderson, Nevada. Dr. Rick Abelson held a 90% managing

---

[3] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All "Rule" references are to the Federal Rules of Bankruptcy Procedure.

membership interest in Horizon Ridge, and Chandrakant Patel held the remaining 10% interest. The Medical Center was Horizon Ridge's only substantial asset. In 2012, Horizon Ridge had a total of four creditors: three unsecured creditors, whose claims totaled no more than $9,000, and the Bank, which held a claim in the amount of approximately $4 million, secured by a deed of trust on the Medical Center.

Apparently, a relatively minor[4] dispute arose between Horizon Ridge and the Bank concerning tenant improvement deposits. Dr. Abelson met with an attorney to discuss Horizon Ridge's options. Horizon Ridge hired the attorney and his firm, and in a move the bankruptcy court later labeled "improvident," the firm filed a chapter 11 petition in behalf of Horizon Ridge. By all accounts, counsel's performance was abysmal. According to Dr. Abelson, the firm misled him as to the progress of the case; failed to discuss with him the significance of the § 1121(b) exclusivity period or the need to propose a reorganization plan before it expired; sent an inexperienced attorney unfamiliar with the case to appear in court; and refused to return Dr. Abelson's increasingly distressed phone calls.[5]

Meanwhile, after Horizon Ridge's exclusivity period expired with no plan having been proposed, the Bank promptly filed its own chapter 11 plan, proposing to liquidate substantially all of

---

[4] The bankruptcy court noted that the amount in controversy was "less than $200,000." Gordon Silver represented in its brief on appeal that it was less than $90,000.

[5] In the bankruptcy court's more pithy description, the attorneys "didn't have any idea what the devil they were doing."

Horizon Ridge's assets, consisting primarily of the Medical Center (the "Liquidation Plan"). The Liquidation Plan proposed to sell the Medical Center, with the proceeds to be applied to the Bank's allowed secured claim and any surplus to be distributed to Dr. Abelson and Mr. Patel, whose membership interests in Horizon Ridge would be extinguished. The administrator of the Liquidation Plan would be required to pay all allowed administrative expense claims, as well as all allowed unsecured claims, in full, regardless of the amount generated by the sale of the Medical Center. Together with the Liquidation Plan, the Bank filed a motion requesting entry of an order confirming that no disclosure statement would be required for the Liquidation Plan, as each interested party's acceptance or rejection was implied as a matter of law without the need to vote.[6]

This motion was set for hearing on September 26, 2012, together with the following motions made by Horizon Ridge: (1) a motion to value the Medical Center and "strip" the Bank's lien; (2) a motion to dismiss the case; and (3) an objection to the Bank's secured claim. In the latter two motions, Horizon Ridge argued that the Bank was not the proper party in interest to assert its secured claim. The day before the September 26 hearing, Horizon Ridge filed its own plan of reorganization and

[6] We exercise our discretion to take judicial notice of documents filed in the Debtor's bankruptcy case. See Fear v. United States Trustee (In re Ruiz), 541 B.R. 892, 894 n.3 (9th Cir. BAP 2015); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

4

disclosure statement, both of which were set for hearing on October 31. At the September 26 hearing, the bankruptcy court denied all of Horizon Ridge's motions and granted the Bank's motion. The bankruptcy court also scheduled a confirmation hearing on the Liquidation Plan for November 14, 2012, just two weeks after the scheduled initial hearing on Horizon Ridge's plan and disclosure statement.

**B. Events following retention of Gordon Silver**

Following the September 26 hearing, Dr. Abelson sought substitute counsel for Horizon Ridge to salvage the situation. Ultimately, he selected Gordon Silver, whom he paid a $40,000 retainer out of his personal bank account. Shortly after being retained, Gordon Silver filed an application to approve its employment, along with an amended plan of reorganization (the "Reorganization Plan") and accompanying disclosure statement. The Reorganization Plan proposed to pay holders of priority claims, in full, no sooner than 90 days after the effective date of the plan. General unsecured creditors would also receive payment in full, but the payments would be distributed in installments over a period of six months. As for the Bank's secured claim, Horizon Ridge proposed to make interest-only payments for three years, followed by four years of principal and interest payments, amortized over a thirty-year period, with a substantial balloon payment coming due at the end of the seventh year.

The Bank objected to Gordon Silver's employment application. It argued that Dr. Abelson's payment of the $40,000 retainer, together with the provisions of the Reorganization Plan - which

5

the Bank viewed as unreasonably indulgent toward equity holders and hostile toward the Bank - demonstrated that Gordon Silver was not disinterested and represented an interest adverse to the estate, namely Dr. Abelson himself. After hearing, the bankruptcy court approved Gordon Silver's employment. To address the Bank's concern about the potentially conflicting interests of the bankruptcy estate and Dr. Abelson, the bankruptcy court ordered Dr. Abelson to retain independent counsel. Dr. Abelson did so, and attorney Dorothy Bunce eventually docketed a notice of appearance on his behalf.

Over the Bank's opposition, the bankruptcy court granted conditional approval of Horizon Ridge's disclosure statement and rescheduled the hearing on confirmation of the Liquidation Plan to take place simultaneously with a newly scheduled confirmation hearing for the Reorganization Plan. This hearing was postponed several times over the course of the next year, as the parties litigated a series of related issues, including:

(1) After an evidentiary hearing on valuation of the Medical Center, the bankruptcy court entered an order determining its value to be $3,975,000.

(2) After a hearing on Horizon Ridge's objection to the Bank's secured claim, the bankruptcy court disallowed the claim to the extent of an asserted prepayment premium of $192,176.20. The bankruptcy court further disallowed the portion of the claim asserting postpetition interest in the amount of $578,036.18 on the grounds that the Bank's claim was undersecured, based on the determined value of the Medical Center. Otherwise, the bankruptcy court allowed the Bank's claim as a secured claim in

6

the amount of $3,975,000 (i.e., the value of the Medical Center) and as an unsecured claim in the amount of $369,314.52.

The day before the final evidentiary hearing concerning confirmation of the competing plans (the "Confirmation Hearing"), Horizon Ridge filed a second amended plan of reorganization (the "Amended Reorganization Plan"). The Amended Reorganization Plan made two significant changes to the original Reorganization Plan. First, it bifurcated the Bank's claim into a secured and an unsecured claim, with the unsecured claim placed in a class by itself, separate from the unsecured claims of other creditors. The Amended Reorganization Plan proposed to pay both of the Bank's claims on the same seven-year timetable as previously proposed. Second, the Amended Reorganization Plan included a guaranty by Dr. Abelson and Mr. Patel of the monthly payments on the Bank's claims during that seven-year period. Guaranty payments were made contingent on a request from Horizon Ridge, and they did not include a guaranty of the final balloon payment as contemplated by the Amended Reorganization Plan.

## C. Confirmation

The Confirmation Hearing took place on September 16 and 17, 2013. Following argument at a separate hearing, the bankruptcy court entered two orders, one denying confirmation of the Amended Reorganization Plan and a second order confirming the Liquidation Plan.

### 1. Denial of confirmation of the Amended Reorganization Plan

The bankruptcy court's first reason for denying confirmation of the Amended Reorganization Plan was the inadequacy of the

7

disclosure statement. Because nearly a year had passed between the conditional approval of the disclosure statement and the Confirmation Hearing, the disclosure statement was out of date with respect to its statements regarding the Medical Center's occupancy rate, and it failed to provide accurate information concerning the projected future occupancy rate. For the same reason, the disclosure statement grossly underreported the amount of administrative claims: the disclosure statement stated that administrative claims were $29,000; by the time of the Confirmation Hearing, the amount had increased to $350,000. Finally, because the disclosure statement was drafted with the original Reorganization Plan in mind, it did not reveal that, under the Amended Reorganization Plan, the Bank held by far the largest unsecured claim.

Second, the bankruptcy court found that the Amended Reorganization Plan was not proposed in good faith. The court noted that, prior to the creation under the Amended Reorganization Plan of a separate class for the Bank's unsecured claim, this claim would have had to be classified with the other, much smaller, unsecured claims. In that event, no impaired class of claims would have voted to accept the plan, making confirmation impossible under § 1129(a)(10). The Amended Reorganization Plan was designed to circumvent this problem by segregating the Bank's large unsecured claim into its own class. This allowed the other unsecured creditors - whose claims were impaired only by virtue of the proposed delayed payment - to constitute an accepting impaired class. The bankruptcy court found this "gerrymandering" indicative of bad faith, citing Beal

8

Bank USA v. Windmill Durango Office, LLC (In re Windmill Durango Office, LLC), 481 B.R. 51, 68 (9th Cir. BAP 2012). See also Village Green I, GP v. Fed. Nat'l Mtg. Ass'n (In re Village Green I, GP), ___ F.3d ___, 2016 WL 325163 at *2 (6th Cir. Jan. 27, 2016) (impairment of minor claims in form of 60-day delay in payment was "an artifice to circumvent the purposes of § 1129(a)(10)" and required denial of confirmation due to bad faith). Also indicative of bad faith, the court found, was the "allocation of substantially all the risk of failure" of the Amended Reorganization Plan to the Bank.

Third, the court found that the Amended Reorganization Plan was not in the best interests of creditors, because it proposed to pay the Bank's secured claim over a seven-year period with 5% interest. The court found that this was less than what the Bank would receive on account of its secured claim in the event of liquidation.

Fourth, the court found that the Amended Reorganization Plan was not feasible, and that the risk of future liquidation or reorganization was unacceptably high. In particular, the court found it unlikely that Horizon Ridge would be able to make the balloon payment at the end of the seven-year period. Given the "perilous" nature of Horizon Ridge's prospective occupancy rates for the years to come, the court found even the periodic payments during the seven-year period would likely be infeasible.

Finally, the bankruptcy court found that the Amended Reorganization Plan was not fair and equitable. The court found that the cash payments to the Bank contemplated by the Amended Reorganization Plan would not equal the present value of the

Medical Center. Moreover, the court found that the Amended Reorganization Plan ran afoul of the absolute priority rule, which precludes equity holders from retaining their equity unless all creditors are paid in full. And since Dr. Abelson and Mr. Patel would provide only a contingent guaranty, the court found this provision insufficient to trigger the new value exception to the absolute priority rule.

### 2. **Confirmation of the Liquidation Plan**

Although the class of equity holders was deemed to have rejected the Liquidation Plan, the bankruptcy court determined that it could be confirmed under the "cramdown" provision of § 1129(b)(1). The court rejected Horizon Ridge's arguments that the Liquidation Plan was insufficiently specific as to the nature of the proposed liquidation sale, the assets to be sold and the identity of the plan administrator. Horizon Ridge also objected on the ground that the Liquidation Plan failed to provide for assumption or rejection of the leases of the Medical Center's tenants, but the court concluded that this failure was not fatal under applicable law, as the leases would ride through the confirmation process.

On three points, however, the bankruptcy court made confirmation conditional on amendments to the Liquidation Plan. First, the court required the Bank to amend the plan to provide for payment in full of unsecured claims on the effective date of the plan, rather than the closing date of the proposed liquidation sale. Second, the court required the Bank to remove a paragraph providing for exculpation of the Bank, as such provisions "cannot be permitted to stand" under Ninth Circuit

10

law.  Finally, the court took issue with a provision in the Liquidation Plan that would have permitted the plan administrator to review and approve administrative claims.  This "attempt[] to overreach and have [the] Plan Administrator assume the court's duties under the code" would also have to be removed.  The Bank complied with the court's requirements by filing an amended Liquidation Plan.

**D.  Postconfirmation events and Gordon Silver's fees**

After the Liquidation Plan was confirmed, the litigation between the Bank and Horizon Ridge continued.  Horizon Ridge opposed the Bank's proposed procedures for conducting the liquidation sale contemplated by the Liquidation Plan.  The sale itself apparently was contentious as well, with two entities, including one newly organized by Dr. Abelson, bidding cash against the Bank's escalating credit bids.  The Bank's winning credit bid of $4,420,000 exceeded the previously determined value of Horizon Ridge's assets.  Horizon Ridge appealed a total of five orders of the bankruptcy court relating to confirmation and the sale.  Though Horizon Ridge sought stays pending appeal, these were denied.  The five appeals have been dismissed.

On July 14, 2014, nearly two years after its employment had been approved, Gordon Silver filed a final application for payment of its fees and expenses ("Fee Application").  The Fee Application sought final approval of payment to Gordon Silver in the total amount of $512,741.30.  The Bank objected to the Fee Application, renewing its argument that Gordon Silver had been working solely for the benefit of Dr. Abelson and Mr. Patel, rather than the estate.  The Bank did not object to the

11

reasonableness of any particular entry in Gordon Silver's billing itemization.

The bankruptcy court held two hearings on the Fee Application. At the first of these hearings (the "First Fee Hearing"), the court heard argument from Gordon Silver and the Bank's counsel. Gordon Silver argued that the Bank was obligated by its own Liquidation Plan to pay administrative expenses and that Gordon Silver's rates and billing were reasonable. At this point, the bankruptcy court commented that reasonableness of rates was not at issue:

> THE COURT: Well, I don't think [the Bank's attorney] Mr. Weiss's objection is that your rates were unreasonable. I think Mr. Weiss's objection was that you did a lot of work that benefitted -- potentially benefitted the principal of the debtor as opposed to the debtor itself.
>
> MS. KOZLOWSKI: Fair enough. And really that comes down to the reasonableness, reasonably likely to benefit the estate prong.

After argument and colloquy, primarily related to this issue, the bankruptcy court concluded the hearing and scheduled an additional hearing (the "Second Fee Hearing"), at which the court would announce its decision.

At the Second Fee Hearing, the bankruptcy court stated on the record that it would approve Gordon Silver's fees in full. The court elaborated:

> . . . I think it's unfortunate that we had what started out as an under $200,000 fight but has led to I think in excess of a million and a half dollars in attorneys' fees. But both parties have to participate in the fight. If the bank pushes back, the debtor gets to push back. . . .
>
> . . . .

12

I was a little surprised . . . [that the Bank] bid actual money for –– at the time of the sale and overbid certain other bids, which would have [paid the Bank's allowed claims] in full.

But I don't think there is anything wrong with the fees of Gordon Silver. I think the fees –– as I understand it, the fees of the bank are in excess of a million dollars. . . .

The work that was done by both sides was good. I think it's unfortunate that the parties were not able to resolve this at some lesser sum. But as I indicated, the debtor is allowed to pursue their positions, the bank is allowed to pursue their positions, and in this case it led to a great deal of money being expended.

I am going to approve Gordon Silver's fees in total. The general objection was that they weren't reasonable. I think in the context of the case, they were reasonable.

Following the Fee Hearing, the bankruptcy court entered an order granting the Fee Application ("Fee Order"). In the Fee Order, the bankruptcy court noted that it had "considered the oral argument presented [at the First Fee Hearing]" and "stated its findings of fact and conclusions of law on the record at [the Second Fee Hearing]." The court ordered that the Fee Application was approved and that Gordon Silver's fees were incurred for services "necessary and beneficial to the estate."

This timely appeal of the Fee Order followed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Whether the bankruptcy court identified and applied the correct legal standard to its ruling on the Fee Application.

2. Whether the bankruptcy court's findings of fact in

13

connection with the Fee Order were clearly erroneous.

## IV.    STANDARDS OF REVIEW

We review an award of professional compensation for abuse of discretion. Smith v. Edwards & Hale (In re Smith), 317 F.3d 918, 923 (9th Cir. 2002). A bankruptcy court abuses its discretion only if it applies an incorrect legal standard or misapplies the correct legal standard, or if its factual findings are illogical, implausible or unsupported by evidence in the record. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011); United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). We may affirm the decision of the bankruptcy court on any basis supported by the record. See ASARCO, LLC v. Union Pac. R.R. Co., 765 F.3d 999, 1004 (9th Cir. 2014); Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

## V.    DISCUSSION

**A.   What is the proper legal standard?**

Before we can determine whether the bankruptcy court applied the proper legal standard in evaluating the Fee Application, we must determine what that standard is.

Compensation of professionals is governed by §§ 327 and 330. Section 327 provides for "reasonable compensation for actual, necessary services" and "reimbursement for actual, necessary expenses." Section 330(a)(3), in turn, requires the bankruptcy court to consider "all relevant factors" in determining reasonableness of compensation, including the following:

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the

14

administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners other than in cases under this title.

11 U.S.C. § 330(a)(3)(A)-(E). Expressly excluded from compensation are services that are not "reasonably likely to benefit the debtor's estate" or "necessary to the administration of the case." 11 U.S.C. § 330(a)(4)(A). See also Ferrette & Slater v. United States Trustee (In re Garcia), 335 B.R. 717, 723-24 (9th Cir. BAP 2005). Professional services need not result in an actual material benefit to the estate in order to be compensable. In re Garcia, 335 B.R. at 724. "Instead, a professional need demonstrate only that the services were reasonably likely to benefit the estate at the time rendered." Id.

A professional requesting compensation must exercise "reasonable billing judgment" in incurring its fees. Leichty v. United States Trustee (In re Strand), 375 F.3d 854, 860 (9th Cir. 2004) (quoting Roberts, Sheritan & Kotel, P.C. v. Bergen Brunswig Drug Co. (In re MEDNET, MPC Corp.), 251 B.R. 103, 108 (9th Cir. BAP 2000)). Reasonable billing judgment includes consideration of these questions:

(a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?

(b) To what extent will the estate suffer if the

15

services are not rendered?

> (c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?

In re Garcia, 335 B.R. at 724; In re MEDNET, 251 B.R. at 108.

Some bankruptcy courts have denied compensation to attorneys for chapter 11 debtors based on a finding that the attorneys' services primarily benefitted debtors personally or their principals rather than the estate. See, e.g., In re Love, 163 B.R. 164, 174-76 (Bankr. D. Mont. 1993) (attorney's services benefitting individual chapter 11 debtor, including defense of debtor's family members and insiders in adversary proceedings, were not compensable); In re Grabill Corp., 110 B.R. 356, 359-60 (Bankr. N.D. Ill. 1990) (after appointment of chapter 11 interim trustee, debtor's counsel's efforts to oppose expansion of trustee's powers benefitted only prepetition management and were not compensable); In re Kendavis Inds. Intern., Inc., 91 B.R. 742, 748-51 (Bankr. N.D. Tex. 1988) (compensation reduced for attorneys' services in proposing a plan "inexplicably generous to stockholders" where "substantial documentary evidence" showed that attorneys in fact represented equity holders).

We agree that debtors' attorneys may not be compensated by the estate for services rendered entirely for the benefit of principals or other non-debtor parties, because such services are not "reasonably likely to benefit the debtor's estate." 11 U.S.C. § 330(a)(4). In exercising "reasonable billing judgment," the first question an attorney must consider is whether "the burden of the probable cost of legal services [is] disproportionately large in relation to the size of the estate

16

and maximum probable recovery." In re Garcia, 335 B.R. at 724. Because the attorney is employed by the estate, it necessarily follows that the attorney must consider the "burden" and the "maximum probable recovery" **to the estate**.

**B. Did the bankruptcy court apply the correct standard?**

The Bank argues that the bankruptcy court failed to apply the proper legal standard in its findings and conclusions made in connection with the Fee Order. More specifically, the Bank argues that, although the court stated at the Second Fee Hearing that Gordon Silver's fees were "reasonable," it "did not consider the identity of Gordon Silver's true client."

Although it is true that the bankruptcy court did not frame its oral findings and conclusions in terms of "the identity of Gordon Silver's true client," a review of the transcript of the First Fee Hearing leaves no doubt that the court "consider[ed]" the issue of whose interests were furthered by Gordon Silver's services. During Gordon Silver's oral argument, the bankruptcy court specifically redirected the discussion to that very issue, which discussion dominated most of the 22-minute hearing. As noted above, the "true client" issue is part of the broader question of whether services are "reasonably likely to benefit the debtor's estate." By making findings and conclusions in Gordon Silver's favor following extensive briefing and oral argument primarily devoted to that issue, the bankruptcy court made it clear that it had considered and rejected the Bank's argument. The bankruptcy court's comments that "if the bank pushes back, **the debtor** gets to push back" and that "**the debtor** is allowed to pursue [its] positions" further demonstrate that

17

the court found Gordon Silver's litigation activities to have been conducted on behalf of the debtor, Horizon Ridge, rather than Dr. Abelson and Mr. Patel.

The language of the Fee Order itself provides additional support for this conclusion. In the Fee Order, the bankruptcy court stated that its decision followed consideration of the oral argument presented at the First Fee Hearing. The Fee Order went on to recite that Gordon Silver's services were "necessary and beneficial to the estate."

We conclude that the bankruptcy court applied the proper legal standard.

**C. Did the bankruptcy court clearly err in its findings?**

Having concluded that the bankruptcy court applied the correct standard, we must affirm unless we conclude its findings "were illogical, implausible or without support in inferences that may be drawn from facts in the record." Hinkson, 585 F.3d at 1262. On this record, we cannot so conclude.

The Bank concedes that Gordon Silver's efforts were reasonably likely to benefit the estate from the commencement of its employment to the moment the bankruptcy court determined that the value of the Medical Center was less than the amount of the Bank's allowed claims. After that point, the Bank argues, it was established conclusively that equity holders had no legitimate interest in continuing the fight. Thus, to extend this reasoning, since the unsecured creditors expressed no preference between the Liquidation Plan and the Reorganization Plan, the only interested party left standing was the Bank, whose interests became paramount. By this logic, anything Gordon Silver did that

18

was adversarial toward the Bank was necessarily not in the best interests of the estate. The bankruptcy court was not required to accept this narrow definition of the estate's interests.

As the bankruptcy court noted at the Second Fee Hearing, both the Bank and Horizon Ridge vigorously pursued their respective litigation positions at enormous expense rather than "resolv[ing] this at some lesser sum." Although the Bank prevailed both at the Confirmation Hearing and in most of the postconfirmation disputes, it does not follow that the bankruptcy court clearly erred in finding that Gordon Silver's fees were reasonable "in the context of the case." Granted, Gordon Silver billed a large proportion of its fees in connection with its efforts to confirm a plan that ultimately was found to be unconfirmable and not proposed in good faith. Nevertheless, nothing in the record compelled the bankruptcy court to find that the project was hopeless or that Gordon Silver's services were not reasonably likely to confer a benefit on the estate, whether in the form of a confirmable plan or a consensual resolution between the Bank and Horizon Ridge.

Indeed, as the bankruptcy court commented at the First Fee Hearing, the sale price of the Medical Center was significantly higher than its value as previously determined by the court. This fact lends support to the proposition that, at the time Gordon Silver rendered its services, it was not unreasonable to expect that Horizon Ridge could propose a confirmable reorganization plan or achieve a consensual resolution. Notwithstanding the fact that these happy outcomes did not occur, there was sufficient evidence in the record before the bankruptcy

19

court to support the finding that the services were "reasonably likely to benefit the estate at the time rendered." In re Garcia, 335 B.R. at 724.

## VI.    CONCLUSION

Based upon the foregoing, we conclude that the bankruptcy court did not abuse its discretion in approving the Fee Application.  We AFFIRM.